USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _______________
DATE FILED: 9/17/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

BRIDGETTE KNOWER,

Plaintiff,

-v-

MOUNT SINAI HEALTH SYSTEMS, INC., *et al.*,

Defendants.

---------------------------------------------------------------- X

1:24-cv-6081-GHW

MEMORANDUM OPINION & ORDER

GREGORY H. WOODS, United States District Judge:

Perfusionist Bridgette Knower believed that a colleague had put her patient at risk during an open-heart surgery. According to Ms. Knower, fellow perfusionist Siedel Hood repeatedly failed to retrieve a cable that she requested and then threw it over the cardiopulmonary bypass lines carrying blood to and from the patient. Although the patient was unharmed, Ms. Knower reported to her supervisor that Mr. Hood's conduct posed a serious patient safety risk. Mount Sinai investigated the incident, concluded that patient safety had not been compromised, instituted refresher safety training, and expected Ms. Knower and Mr. Hood to continue working together. That response did not satisfy Ms. Knower. She continued to press her concerns and ultimately resigned.

Ms. Knower contends that Mount Sinai and her supervisor retaliated against her for raising her patient safety concerns by threatening her employment and constructively discharging her in violation of New York Labor Law Sections 740 and 741. But no reasonable jury could find that Ms. Knower was constructively discharged because her dissatisfaction with Mount Sinai's response and the prospect of working with Mr. Hood again did not make her working conditions objectively intolerable. But there is a disputed issue of fact regarding whether Ms. Bruce threatened Ms. Knower with employment consequences because she continued to press her patient safety concerns. Because Section 740 makes such threats actionable and Section 741 does not, Defendants' motion

for summary judgment is GRANTED as to Ms. Knower's Section 741 claim and DENIED as to her Section 740 claim.

## I. BACKGROUND

### A. Facts[1]

Ms. Knower began working at Mount Sinai Morningside ("Mount Sinai") as a temporary perfusionist around March 2022 and became a full-time employee in June 2022. Defs. 56.1 ¶¶ 1–2. A perfusionist is responsible for keeping a patient alive while the patient is on cardiopulmonary bypass ("CPB") during heart surgery and operates equipment that maintains the patient's circulation during that period. *Id.* ¶ 3; Dkt. No. 53 ("Brustein Decl."), Ex. 4 at 15:3–6. Mount Sinai's perfusion team consisted of Chief Perfusionist Aristoteli Dorizas, Ms. Knower, Mr. Hood, and one other perfusionist. Defs. 56.1 ¶¶ 5–6. Mr. Dorizas was on leave from late November 2023 until January 22, 2024. *Id.* ¶ 31. During his absence, Anna Bruce-Vanderpuije, Mount Sinai's Administrative Director for Cardiac Surgery, served as Ms. Knower's acting supervisor. Pl. 56.1 ¶ 178.

On December 11, 2023, Ms. Knower was the primary perfusionist during an open-heart surgery. Defs. 56.1 Resp. ¶ 118. As the procedure approached the end of the CPB phase, Ms. Knower determined that a piece of equipment called the intra-aortic balloon pump required an EKG slave cable and asked a nurse to call Mr. Hood to assist her. Pl. 56.1 ¶ 131. According to Ms. Knower, Mr. Hood repeatedly told her that she did not need the cable and did not retrieve it until she had requested it several times. Dkt. No. 52 ("Knower Decl.") ¶¶ 9, 14, 16, 19, 22–23. When Mr. Hood eventually retrieved the cable, Ms. Knower states that he threw it over the CPB lines while those lines remained connected to the patient. *Id.* ¶ 24. Ms. Knower believed that placing the

[1] The facts are drawn from the parties' Local Rule 56.1 statements, Dkt. No. 48 ("Defs. 56.1"); Dkt. No. 54 ("Pl. 56.1"); Dkt. No. 57 ("Defs. 56.1 Resp."), and other documents submitted in connection with Defendants' motion for summary judgment. They are undisputed in relevant part unless otherwise noted, and where disputed, the Court resolves all ambiguities and draws all permissible factual inferences in favor of Ms. Knower, as the party against whom summary judgment is sought. *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).

cable over the CPB lines presented a serious risk to patient safety. *Id.* ¶¶ 25, 39. But it is undisputed that the patient was not harmed during the procedure. Defs. 56.1 Resp. ¶ 165.

Ms. Knower began reporting her concerns to Mr. Dorizas that day. She told him that what had occurred was not an ordinary disagreement and that she was concerned because the incident involved her patient. Brustein Decl., Ex. 3 at 36:20–37:19. Mr. Dorizas told her that she could not choose who assisted her on cases. Defs. 56.1 ¶ 35.

The next day, Ms. Knower raised the same concerns with Ms. Bruce, writing that Mr. Hood's conduct had "directly affected the quality of care of my patient" and that "[w]orking with him in my room in the future is concerning and these issues must be addressed immediately." Dkt. No. 44 ("Buccellato Decl."), Ex. 2 at 53. She also told Ms. Bruce that she could not "rely on [Mr. Hood] helping my patient in a timely and professional manner, as well as in a safe way that will not affect quality of care." *Id.* at 50.

On December 13, she told Mr. Dorizas that she intended to take a mental health day and that she "really want[ed] this thing with Siedel to be settled." Dkt. No. 56, Ex. 1 at 13. On December 14, she emailed Mr. Dorizas that she would be taking another sick day and needed to figure out whether she could "comfortably, safely, and effectively perform [her] job with Siedel as a backup Perfusionist." Brustein Decl., Ex. 8 at 2. Mr. Dorizas forwarded the email to Ms. Bruce and Ann McNicholas of Mount Sinai's Department of Labor Relations, writing, "Bridgette Knower took a sick day today and she's taking another tomorrow . . . . Can I acknowledge this as a refusal to work? What are the appropriate steps moving forward to address this issue?" *Id.* at 1.

On December 19, Ms. Bruce conducted separate fact-finding meetings with Ms. Knower and Mr. Hood regarding the incident. Defs. 56.1 ¶ 39. Eugene Robinson, their union delegate, attended the meetings. *Id.* ¶ 40. Mr. Robinson worked as a Lead Inventory Specialist in Mount Sinai's Materials Management Department. *Id.* ¶ 41. He did not work in the perfusion department

or supervise Ms. Knower. *Id.* ¶ 42. During her fact-finding meeting, Ms. Knower told Ms. Bruce that she had to ask Mr. Hood for the cable multiple times and that he eventually "threw it" over the lines that connected the patient to the bypass pump. Buccellato Decl., Ex. 8 ("Dec. 19 Tr.") at 2. Ms. Knower explained that throwing the cable over the lines was "not acceptable in cardiac surgery" and that "[y]ou don't put anything on top of the pump lines." *Id.*

Mr. Robinson told Ms. Knower during the meeting that the "main goal" was "to manage and maintain what we have going on right now to make sure we can work together and . . . not let this go outside the circle." Dec. 19 Tr. at 10. He stated that "if we can't communicate on all levels" and "that patient dies, all of you lose your job." *Id.* He also told Ms. Knower that she and Mr. Hood did not have "to love each other," but they "have to work together," and that "if we can't work together, then . . . this might not be the place for neither one of y'all." *Id.* at 12; Brustein Decl., Ex. 2 ("Bruce Dep.") 183:15–22. Mr. Robinson also stated that he did not "want to make it bigger than what it is" by "get[ting] HR involved" and explained that "HR['s] tolerance is, basically, you can't work together, you both got to leave." Dec. 19 Tr. at 14–15; Bruce Dep. 187:8–9. He also explained that because Mr. Dorizas was on leave, Ms. Bruce "is in charge right now," so "at the end of the day she is the one who will handle this and [Mr. Dorizas] will be informed of the outcome." Bruce Dep. 175:7–13.

On December 19, Ms. Bruce also sought information from people who had been present during the surgery. Defs. 56.1 ¶ 54. Ms. Bruce asked whether patient safety had been compromised, whether cables had been thrown over the pump lines, and whether either perfusionist had exhibited unsafe patient care. *Id.* The cardiac surgeon and the anesthesiologist both reported that they did not observe a disagreement and that patient safety had not been compromised. *Id.* ¶¶ 56–57.

On December 22, Ms. Knower filed a formal "Patient Safety Incident Report" and emailed

Ms. Bruce that she had been told during the fact-finding meeting that "if word of the incident reached HR, [she] faced the possibility of being fired." Defs. 56.1 ¶¶ 48–49. Ms. Bruce forwarded the email to Ms. McNicholas and denied that Ms. Knower had been told she would be fired for reporting the incident and stated that fact-finding and mediation would continue. Dkt. No. 45 ("Bruce Decl."), Ex. 5 at 4–5. Ms. McNicholas separately advised Ms. Bruce that because the proposed informal discussion with Ms. Knower and Mr. Hood was "not a discipline," "a union rep is not needed," adding that although Mr. Robinson, the union delegate, had "been part of this investigation," it was "up to [Ms. Bruce] if management feels best for him to attend." *Id.* at 4.

At a January 8, 2024 mediation with Ms. Knower and Mr. Hood, Ms. Bruce explained that the two witness statements that she had received reflected that "there was no patient care compromised" and "[t]here was no patient safety concern." Buccellato Decl., Ex. 9 ("Jan. 8 Tr.") at 2. She then read a memorandum prepared after the fact-finding stating that "[u]pon conclusion of fact finding, it was unanimously stated no patient care was compromised nor any patient safety concern occurred on that day." *Id.* The memorandum stated that a refresher training on pump and safety protocols would be conducted annually going forward. *Id.* at 2–3; Defs. 56.1 ¶ 76.

During the mediation, Mr. Hood acknowledged that Ms. Knower had asked him more than once for the slave cable. Jan. 8 Tr. at 9. When Ms. Knower asked whether he had thrown the cable over her lines, Mr. Hood responded, "Well, we were in a hurry. I had to throw it over something. Yeah." *Id.* at 10. He later explained that Ms. Knower "was coming off bypass, so I had to throw it over to get to the balloon pump and that's why I threw it over." *Id.* at 12. Mr. Hood also stated that placing the cable over the lines was "a first" for him. *Id.* at 11.

Near the end of the mediation, Ms. Knower stated that she could not trust Mr. Hood and did not want him "around [her] patients" or "in [her] room." *Id.* at 29. Ms. Bruce responded, "[t]hat is not at anyone's discretion." *Id.* at 30; Bruce Dep. 138:21. She then read from Mount

Sinai's Employee Rules of Conduct, including a provision concerning "failure or refusal to perform satisfactory duties and responsibility of one's job or related duties, as assigned," and told both employees that they were "expected to work together." Jan. 8 Tr. at 30; Bruce Dep. 138:19–139:11. Ms. Knower again explained that she believed Mr. Hood's conduct had put her patient at risk. Jan. 8 Tr. at 30–31. Ms. Bruce then stated that she was "making clear what is expected in order to work together" and that "[f]ailure to report to work" or "refusal" to do one's job would be "a different scenario" and "a different Employee Code of Conduct violated." *Id.* at 31. Ms. Bruce also told the employees that "[i]t's okay to report and say there was a patient safety concern" and explained that the planned refresher training was intended to address what "could be done better." *Id.*

In January 2024, Ms. Knower took leave under the Family and Medical Leave Act to care for a family member in Louisiana and did not return to work at Mount Sinai. Defs. 56.1 ¶¶ 80–81. Ms. Knower resigned on April 15, 2024, before she was scheduled to return from leave. *Id.* ¶ 81. She began working as a full-time perfusionist in Louisiana just three days later—on or about April 18, 2024. *Id.* ¶ 83. Ms. Knower testified that the two primary reasons for her resignation were that she believed that her job had been threatened and that Ms. Bruce had "covered up a significant patient safety concern instead of addressing it so that future patients would not be in danger." Defs. 56.1 Resp. ¶ 221.

**B. Procedural History**

Ms. Knower commenced this action on August 12, 2024, asserting claims under Sections 740 and 741 of the New York Labor Law against Mount Sinai Health Systems, Inc. and Ms. Bruce (collectively, "Defendants"). Dkt. No. 1. She alleges that Defendants retaliated against her because she raised patient safety concerns arising from the December 11, 2023 surgery. *See id.* ¶¶ 55–64. Defendants answered the complaint on October 3, 2024. Dkt. No. 14. On October 1, 2025, Defendants moved for summary judgment. Dkt. Nos. 43, 49 ("Mem."); Defs. 56.1; Dkt. Nos. 44–

47 (supporting declarations). Ms. Knower opposed the motion on October 31, 2025. Dkt. No. 55 ("Opp'n"); Pl. 56.1; Dkt. Nos. 52–53 (supporting declarations). Defendants replied on November 21, 2025. Dkt. No. 58 ("Reply"); Defs. 56.1 Resp.; Dkt. No. 56 (supporting declaration).

For purposes of their motion, Defendants assume that Ms. Knower engaged in protected whistleblower activity. Reply at 3 n.2. Defendants, however, argue that she cannot establish actionable retaliation. The parties principally dispute whether Ms. Knower was constructively discharged and whether statements by Ms. Bruce and Mr. Robinson, the union delegate, constituted threats made by her employer because of her protected activity.

First, Ms. Knower argues that she was constructively discharged because of Mount Sinai's response to her patient safety concerns. She contends that Defendants "created intolerable workplace conditions by not only not taking patient safety seriously, but also by . . . cover[ing] up the dangerous medical behavior" of Mr. Hood rather than adequately investigating it. Opp'n at 21. She asserts that the investigation "departed in several material respects from the normal procedural sequence for hospital investigations." *Id.* Ms. Knower asserts, among other things, that Defendants failed to pursue aspects of her complaint, rejected her account of the incident, and incorrectly concluded that patient safety had not been compromised. *Id.* at 20–22. According to Ms. Knower, "[a]ny reasonable perfusionist in [her] position would have felt compelled to resign rather than participate in unsafe work practices that could jeopardize the health and safety of her patients." *Id.* at 22.

Defendants argue that Ms. Knower's complaint was "promptly and thoroughly investigated" and that her arguments show "at most" that she was dissatisfied with Mount Sinai's response. Mem. at 12–13. They also assert that, even if the investigation was inadequate, there is no evidence that Defendants' response was intended to force Ms. Knower to resign. *Id.* at 13. And they dispute the premise that continued employment would have required Ms. Knower to participate in unsafe work

practices. Reply at 5.

Second, Ms. Knower identifies statements made by Mr. Robinson, her union delegate, during the December 19 fact-finding meeting as threats to her employment. Mr. Robinson told Ms. Knower that they should "not let this go outside the circle" and that "if we can't communicate on all levels" and a "patient dies, all of you lose your job." Dec. 19 Tr. at 10. He also stated that he did not "want to make it bigger than what it is" by "get[ting] HR involved" and that "HR['s] tolerance is, basically, you can't work together, you both got to leave." *Id.* at 14–15; Bruce Dep. 187:8–9. Ms. Knower's opposition characterizes Mr. Robinson's statements as an explicit threat: "Bring your complaints to HR and you will both be fired." Opp'n at 18. She also states that Mr. Robinson and Ms. Bruce "acted together [sic] leadership in the purported investigation and conducted the factfinding meeting and the mediation together." *Id.* at 10.

In response, Defendants argue that Mr. Robinson "was not threatening Plaintiff's job because she complained about patient care" but was "stating his personal opinion" that Ms. Knower and Mr. Hood could be terminated if their inability to communicate and work together jeopardized patient care. Mem. at 17. They also argue that Mr. Robinson "could not be expressing the opinion of the Hospital" because, as Ms. Knower's union delegate, he represented the union rather than Mount Sinai management. *Id.* Defendants also emphasize that Mr. Robinson did not supervise Ms. Knower, play any role in her employment, or work in her department. *Id.*; Reply at 8–9.

Third, Ms. Knower relies on statements made by Ms. Bruce during the January 8 mediation as threats to her employment. After Ms. Knower said that she could not trust Mr. Hood and did not want him "around [her] patients" or "in [her] room," Ms. Bruce told her that was "not at anyone's discretion," read from Mount Sinai's Employee Rules of Conduct, including a provision concerning the "failure or refusal to perform satisfactory duties and responsibility of one's job or related duties, as assigned," and told both employees that "you are expected to work together." Jan.

8 Tr. at 29–30; Bruce Dep. 138:19–139:11. After Ms. Knower again raised her patient safety concerns, Ms. Bruce stated that she was "making clear what is expected in order to work together" and that "[f]ailure to report to work" or "refusal" to do one's job would be "a different scenario" and "a different Employee Code of Conduct violated." Jan. 8 Tr. at 31.

Ms. Knower argues that a reasonable factfinder could understand that statement as "a threat that Plaintiff's employment could be terminated, if she continued to take sick time related to her patient safety concerns." Opp'n at 19. As support for that inference, she points first to Mr. Dorizas's December 14 email to Ms. Bruce and Ms. McNicholas asking whether her continued absence could be considered a refusal to work. *Id.* at 18–19. She also relies on the fact that Ms. Bruce made the alleged threat after Ms. Knower again tied her unwillingness to work with Mr. Hood to her patient safety concerns. *Id.* at 18.

Defendants characterize the connection between those events as "tenuous" and Ms. Knower's conclusion as an "unwarranted inferential leap." Reply at 9–10. They contend that Ms. Bruce's statement followed an argument between Ms. Knower and Mr. Hood concerning the December 11 incident and "was in reference to Hood and Knower's ability to communicate and work with each other," not Ms. Knower's patient safety complaints. *Id.* at 10.

As to the causal connection between Mr. Robinson's and Ms. Bruce's alleged threats and her protected activity, Ms. Knower argues that the threats were "not just simultaneous to the protected activity but literally in response to and part of the purported investigation into Ms. Knower's protected whistleblower activity." Opp'n at 22. Defendants respond that the challenged statements concerned the employees' ability to work together without jeopardizing patient care, rather than Ms. Knower's disclosure of patient safety concerns. Mem. at 16–17; Reply at 9–10.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). The movant must "identify[] each claim or defense—or the part of each claim or defense—on which" it seeks summary judgment. Fed. R. Civ. P. 56(a). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of showing "the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). If the movant carries that burden, the burden shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Id.* (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)) (emphasis omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. And the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. At summary judgment, the non-movant "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

On a motion for summary judgment, a court is "required to resolve all ambiguities and draw

all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quotation omitted). The court cannot "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

## III. DISCUSSION

### A. New York Labor Law Sections 740 and 741

New York Labor Law Section 740, often referred to as New York's "whistleblower law," prohibits an employer from taking "retaliatory action" against an employee "because" such employee "discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety." N.Y. Lab. Law § 740(2)(a).

The statute defines an "employer" as "any person, firm, partnership, institution, corporation, or association that employs one or more employees." *Id.* § 740(1)(b). The term "retaliatory action" means "an adverse action taken by an employer or his or her agent to discharge, threaten, penalize, or in any other manner discriminate against any employee" for engaging in protected activity and includes "adverse employment actions or threats to take such adverse employment actions against an employee in the terms of conditions of employment including but not limited to discharge, suspension, or demotion." *Id.* § 740(1)(e).

New York Labor Law Section 741, often referred to as the "health care whistleblower law," is "intended to protect health care workers who complain about unsafe medical practices." *Mirza v. Garnet Health*, No. 20-CV-00556, 2022 WL 826410, at *13 (S.D.N.Y. Mar. 17, 2022), *aff'd sub nom.*

*Mirza v. Orange Reg'l Med. Ctr.*, No. 22-815-CV, 2024 WL 3042239 (2d Cir. June 18, 2024) (summary order). Section 741 protects only employees who "perform[] health care services for and under the control and direction of any public or private employer which provides health care services for wages or other remuneration." N.Y. Lab. Law § 741(1)(a). The statute defines an "employer" as "any partnership, association, corporation, the state, or any political subdivision of the state" that provides health care services in one of several specified settings, including hospitals. *Id.* § 741(1)(b).

Section 741 prohibits an employer from taking "retaliatory action" against an employee "because" the employee "discloses or threatens to disclose to a supervisor, to a public body, to a news media outlet, or to a social media forum available to the public at large, an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care or improper quality of workplace safety." *Id.* § 741(2)(a).

The operative phrase "improper quality of patient care" means "any practice, procedure, action or failure to act of an employer which violates any law, rule, regulation or declaratory ruling adopted pursuant to law, where such violation relates to matters which may present a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient." *Id.* § 741(1)(d). And a "retaliatory action" under Section 741 is defined to mean "the discharge, suspension, demotion, penalization or discrimination against an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." *Id.* § 741(1)(g). Unlike Section 740, Section 741 does not enumerate a threat to take adverse employment actions as a "retaliatory action."

For an employer to "fall afoul of the [whistleblower] statute," "the adverse action must [have been] taken 'because' the employee engaged in protected activity. In other words, the whistleblower statute . . . requires some causal connection between an adverse personnel action and [the] report[ed] . . . activity." *Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 354 (S.D.N.Y. 2017) (quoting

*Varughese v. Mount Sinai Med. Ctr.*, No. 12 Civ. 8812, 2015 WL 1499618, at *68 (S.D.N.Y. Mar. 27, 2015)); *see also Mottley v. Connectone Bancorp, Inc.*, No. 25-CV-3609, 2026 WL 1785176, at *2 (E.D.N.Y. June 22, 2026) ("[A] failure to establish such a causal connection would necessitate dismissal of plaintiff's claim.").

Both statutes supply an affirmative defense, providing that "it shall be a defense" if the challenged action was "predicated upon grounds other than the employee's exercise of any rights protected by this section." N.Y. Lab. Law §§ 740(4)(c), 741(5). "[O]nce a defendant establishes that the adverse employment action was not predicated on the employee's exercise of his protected rights, it is plaintiff's burden to 'raise a triable issue of fact as to whether the grounds asserted by the defendant[] for the termination of his employment [a]re unsupported by the facts or a pretext.'" *Mottley*, 2026 WL 1785176, at *3 (quoting *Lukose v. Long Island Med. Diagnostic Imaging, P.C.*, 993 N.Y.S.2d 84, 86 (2d Dep't 2014)). "[A] plaintiff can establish pretext for purposes of defeating summary judgment 'by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.'" *Id.* (quoting *Palencar v. N.Y. Power Auth.*, 834 F. App'x 647, 651 (2d Cir. 2020) (summary order)).

### B. Because Ms. Knower Was Not Constructively Discharged, She Has Not Established an Adverse Employment Action Under Section 741

No reasonable jury could find that Ms. Knower was constructively discharged because the record does not permit a reasonable jury to find that her working conditions were objectively intolerable or that Defendants deliberately created those conditions. "Under New York law, '[c]onstructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Kemp v. Regeneron Pharms., Inc.*, 117 F.4th 63, 71–72 (2d Cir. 2024) (quoting *Morris v. Schroder Cap. Mgmt. Int'l*, 7 N.Y.3d 616, 621 (2006)). "[T]he actions of the employer in creating the intolerable workplace condition must be deliberate and intentional, and the atmosphere in the

workplace must be so intolerable as to compel a reasonable person to leave." *Morris*, 7 N.Y.3d at 622 (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000); *Petrosino v. Bell Atl.*, 385 F.3d 210, 231 (2d Cir. 2004)).

**1. Ms. Knower's Working Conditions Were Not Objectively Intolerable**

No reasonable jury could find that the prospect of working with Mr. Hood again made Ms. Knower's working conditions objectively intolerable. "[T]he trier of fact must be satisfied that the . . . working conditions [were] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Morris*, 7 N.Y.3d at 622 (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)). "Generally, 'a disagreement with management over the quality of an employee's performance will not suffice to establish a constructive discharge.'" *Murphy v. Dep't of Educ. of City of N.Y.*, 64 N.Y.S.3d 237, 241 (2d Dep't 2017) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)). And an employee's dissatisfaction with work assignments is also generally insufficient to establish constructive discharge. *See Short v. Deutsche Bank Sec., Inc.*, 913 N.Y.S.2d 64, 66 (1st Dep't 2010). By contrast, allegations that an employer and management "humiliated, ostracized, and sexually harassed [an employee], and told her that they would 'make her life miserable until she quit'" in response to her reporting violations of federal regulations were sufficient to allege constructive discharge. *Pugliese v. Actin Biomed LLC*, 967 N.Y.S.2d 16, 16 (1st Dep't 2013).

Ms. Knower identifies the allegedly intolerable working condition as being required to "participate in unsafe work practices that could jeopardize the health and safety of her patients." Opp'n at 22. At bottom, however, the working condition that Ms. Knower found intolerable was the prospect of working with Mr. Hood again. From the outset, Ms. Knower told Mr. Dorizas and Ms. Bruce that she did not feel comfortable working with Mr. Hood as her backup perfusionist. And during the January 8 mediation, she stated that she could not trust Mr. Hood and did not want

him "around [her] patients" or "in [her] room." Jan. 8 Tr. at 29. Ms. Bruce responded that this was "not at anyone's discretion" and told Ms. Knower and Mr. Hood that they were "expected to work together." *Id.* at 29–30; Bruce Dep. 138:19–139:11.

Assuming that Mr. Hood's conduct on December 11 posed a safety risk, the record identifies only a single incident of unsafe conduct. Mr. Hood stated that placing the cable over the CPB lines was "a first" for him, Jan. 8 Tr. at 11, and Ms. Knower identifies no evidence that he had engaged in similar conduct before or that similar conduct was likely to recur. Mount Sinai also instituted refresher training on pump and safety protocols following the incident. The prospect that Ms. Knower might again be assigned to work with a coworker who had committed one safety-related error falls well short of working conditions so intolerable that a reasonable person would have felt compelled to resign.

Ultimately, Ms. Knower disagreed with Mount Sinai's decision to continue employing Mr. Hood without ensuring that she would not have to work with him again. The prospect of working with Mr. Hood again is far closer to a disagreement about work assignments, *see Short*, 913 N.Y.S.2d at 66, than the objectively intolerable conditions that have supported a constructive discharge, such as humiliation, ostracism, sexual harassment, and threats to "make [an employee's] life miserable until she quit," *see Pugliese*, 967 N.Y.S.2d at 16. No reasonable jury could find that the prospect of having to work with Mr. Hood again rendered Ms. Knower's working conditions objectively intolerable. Ms. Knower's disagreement with her employer's decision not to fire or limit the work of a colleague explains her reason for quitting but does not amount to constructive discharge.

### 2. Defendants Did Not Deliberately Create the Allegedly Intolerable Working Conditions

The record presents no genuine dispute of material fact regarding whether Defendants deliberately created the working conditions that Ms. Knower identifies as intolerable. "[T]he actions of the employer in creating the intolerable workplace condition must be deliberate and intentional."

*Morris*, 7 N.Y.3d at 622 (citing *Whidbee*, 223 F.3d at 73); *see also Kemp*, 117 F.4th at 72. The intent requirement is not satisfied where the intolerable conditions are merely an "incidental effect" of deliberate conduct undertaken for an independent purpose. *See Kader v. Paper Software, Inc.*, 111 F.3d 337, 339 (2d Cir. 1997) (finding no deliberate creation of intolerable working conditions where employer's affair with employee's wife was not undertaken "for the purpose of altering [employee's] working conditions," and any deterioration in those conditions was only an "incidental effect" of the affair).

Ms. Knower contends that Defendants conducted a "sham investigation" that failed to address her patient safety concerns and covered them up. Opp'n at 20–22. But the working condition that she identifies as intolerable was the prospect that she might have to work with Mr. Hood again. Even assuming that the investigation was deficient in the ways Ms. Knower describes,[2] she identifies no evidence that Defendants conducted the investigation that way to keep Mr. Hood employed and to subject Ms. Knower to working with him again.[3] Therefore, Ms. Knower has not presented evidence from which a reasonable jury could find that Defendants deliberately created the working conditions on which her constructive discharge theory depends. Accordingly, Ms. Knower's constructive discharge theory cannot support a claim under either Section 740 or Section

---

[2] The record raises substantial questions about Ms. Knower's characterization of the investigation as a "sham." For example, Ms. Knower asserts that the memorandum prepared after the fact-finding omitted Mr. Hood's admission that he threw the cable over the CPB lines, Opp'n at 12, but Ms. Bruce read the memorandum at the start of the January 8 mediation, before Mr. Hood ever made that admission. Jan. 8 Tr. at 2, 10–12. She also characterizes Ms. Bruce as contradicting Mr. Hood's admission by stating at the end of the mediation that no cables were thrown. Opp'n at 10. But Ms. Bruce was reading the anesthesiologist's witness statement, not making her own factual finding. Jan. 8 Tr. at 31; Bruce Decl., Ex. 3 at 1. Ms. Knower also relies on the testimony of Bonnie Portnoy, the Vice President of Risk Management and Patient Safety at Mount Sinai, to argue that the investigation departed from normal procedures. Opp'n at 13, 21. Although Ms. Portnoy identified several investigative steps that she considered important, she did not testify that those steps were required by any prescribed procedure governing Ms. Bruce's investigation. She also testified that Ms. Bruce's lack of operating room experience would not necessarily concern her if Ms. Bruce consulted others with the relevant expertise. Brustein Decl., Ex. 5 at 32:19–33:11.

[3] There are many other possible motives, such as a desire to avoid potential litigation or reputational harm resulting from the incident. Plaintiff bears the burden to present evidence to show intent. Particularly given the possible alternative explanations for Defendants' alleged conduct, a favorable inference from the evidence presented does not suffice to bridge the gap.

741. And because Section 741, unlike Section 740, does not recognize a threat to take adverse employment action as a retaliatory action, summary judgment is granted on Ms. Knower's Section 741 claim.[4]

### C. A Genuine Dispute Exists as to Whether Ms. Bruce Threatened Ms. Knower Because of Her Protected Activity in Violation of Section 740

The record presents a genuine dispute of material fact as to whether Ms. Bruce threatened Ms. Knower with employment consequences because she continued to press her patient safety complaints.[5] Unlike Section 741, Section 740 expressly includes "threats to take" adverse employment action within its definition of "retaliatory action." N.Y. Lab. Law § 740(1)(e). Ms. Knower identifies a series of disclosures concerning the December 11 incident as protected activity, including her reports to Mr. Dorizas and Ms. Bruce, her "Patient Safety Incident Report," and her renewed complaints about Mr. Hood's conduct during the January 8 mediation. Opp'n at 15–16. For purposes of their motion, Defendants do not challenge Ms. Knower's contention that these were protected activities. Reply at 3 n.2. The Court therefore assumes that the disclosures she

---

[4] Ms. Knower's Section 741 claim may fail for the independent reason that she has not identified any law, rule, regulation, or declaratory ruling that she reasonably believed Mr. Hood violated by failing to provide the slave cable promptly or throwing the cable over the CPB lines. Section 741 protects disclosures of conduct that an employee "in good faith, reasonably believes constitutes improper quality of patient care." N.Y. Lab. Law § 741(2). "Improper quality of patient care," in turn, requires a violation of a "law, rule, regulation or declaratory ruling adopted pursuant to law," where "such violation relates to matters which may present a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient." *Id.* § 741(1)(d). At summary judgment, a plaintiff must identify the particular law, rule, regulation, or declaratory ruling that she reasonably believed was violated. *See, e.g.*, *Mirza*, 2022 WL 826410, at *14; *King v. N.Y.C. Health & Hosps. Corp.*, 925 N.Y.S.2d 820 (1st Dep't 2011). Ms. Knower cites a perfusion textbook stating that "ancillary tubing should be kept clear of the arterial line if at all possible," Knower Decl. ¶ 37, but a textbook is not a law, rule, regulation, or declaratory ruling adopted pursuant to law. And although she states generally that she believed Mr. Hood's conduct "violated regulations for perfusion," she identifies no particular regulation. *Id.* ¶ 41. Defendants did not move for summary judgment on this ground, however, and the Court need not decide that issue because her Section 741 claim fails for the reasons described above.

[5] The Court observes that it is far from clear that Ms. Bruce, as Ms. Knower's supervisor, can be held individually liable under Section 740. *See, e.g.*, *Ruiz v. Lenox Hill Hosp.*, 45 N.Y.S.3d 427, 430 (1st Dep't 2017); *Ulysse v. AAR Aircraft Component Servs.*, 10 N.Y.S.3d 309, 310 (2d Dep't 2015); *Hernandez v. DiaSorin Inc.*, No. 25-CV-00846, 2025 WL 3706579, at *10 (S.D.N.Y. Dec. 22, 2025); *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 277 (S.D.N.Y. 2025). Although Section 740 defines "retaliatory action" as "adverse action taken by an employer or his or her agent," the statute prohibits only an "employer" from taking retaliatory action. N.Y. Lab. Law §§ 740(1)(e), (2). The statute defines "employer" as "any person, firm, partnership, institution, corporation, or association that employs one or more employees," *id.* § 740(1)(b), and the record contains no evidence that Ms. Bruce herself employs any employees. Defendants, however, did not seek dismissal of the claims against Ms. Bruce on this ground at the pleading stage, and they do not seek summary judgment on that ground now. Because no party briefed this issue, the Court does not take it up on its own initiative here.

identifies, including her complaints during the mediation, were protected activities. The dispute here centers on whether Ms. Bruce's statements at the mediation can reasonably be construed as threatening adverse employment action because Ms. Knower engaged in protected activity. That question presents a disputed issue of fact that the Court cannot resolve on summary judgment.

After Ms. Knower stated that she could not trust Mr. Hood and did not want him around her patients or in her operating room, Ms. Bruce told the employees that they were "expected to work together." Jan. 8 Tr. at 30. Ms. Knower then reiterated that she believed Mr. Hood had put her patient at risk. *Id.* at 30–31. Ms. Bruce responded that she was "making clear what is expected in order to work together" and that "[f]ailure to report to work" or "refusal" to do one's job would be "a different scenario" and "a different Employee Code of Conduct violated." *Id.* at 31.

Defendants argue that Ms. Bruce's statement was "in reference to Hood and Knower's ability to communicate and work with each other," rather than Ms. Knower's protected activity. Reply at 10. However, the two issues are inextricably intertwined on this record. Ms. Knower's unwillingness to work with Mr. Hood stemmed from the same patient safety concerns she had repeatedly reported. The Court cannot decide on summary judgment that either interpretation is correct. Therefore, there is a genuine issue of material fact as to whether Ms. Bruce threatened Ms. Knower with discipline because she continued to press those concerns, rather than merely because the two employees could not work together. Accordingly, summary judgment is denied as to Ms. Knower's Section 740 claim.

### D. The Statements by Ms. Knower's Union Delegate Are Not Actionable Because No Reasonable Jury Could Find That He Was Her Employer or Mount Sinai's Agent

The statements by Mr. Robinson, Ms. Knower's union delegate, cannot support her Section 740 claim because no reasonable jury could find that he was her employer or acting as Mount Sinai's agent. A "retaliatory action" under Section 740 must be taken by "an employer or his or her agent." N.Y. Lab. Law § 740(1)(e). The statute defines an "employer" as "any person, firm, partnership,

institution, corporation, or association that employs one or more employees." *Id.* § 740(1)(b). Ms. Knower has presented no evidence that Mr. Robinson employed her or anyone else. Rather, Mr. Robinson was a fellow Mount Sinai employee. Defs. 56.1 ¶ 41.

Section 740 does not define the term "agent," but "New York common law provides that an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'" *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001) (quoting *Meese v. Miller*, 436 N.Y.S.2d 496, 499 (4th Dep't 1981)). The record consistently distinguishes Mr. Robinson's role as Ms. Knower's union delegate from that of Mount Sinai management.[6] The only evidence that Ms. Knower presents to suggest that Mr. Robinson acted as Mount Sinai's agent is that he and Ms. Bruce were "part of leadership for the investigation" and "conducted the factfinding meeting and the mediation together." Opp'n at 10, 17. But no reasonable jury could find from those facts alone that Mr. Robinson was Mount Sinai's agent because neither establishes that Mount Sinai authorized him to act on its behalf and subject to its control.

Moreover, Ms. Knower's argument is based on an erroneous construction of the record. When Ms. Knower and Mr. Hood began to argue during the mediation, Ms. Bruce interrupted them, stating, "This is not an interrogation, so we want to make this clear because no one is of leadership status. You are speaking and respecting each other as colleagues." Bruce Dep. 129:15–19. Later, when they began to argue again, Ms. Bruce stated, "No, no. We are not going to go and engage because, again, as I mentioned before, the only leadership role that is here is the delegate and

[6] On December 22, 2023, Ms. McNicholas advised Ms. Bruce that because the proposed informal discussion was "not a discipline," "a union rep is not needed." Brustein Decl., Ex. 6 at 2. She added that although "Eugene [Robinson] has been part of this investigation," it was "up to you if management feels best for him to attend." *Id.* Mr. Robinson similarly explained during the mediation that "management has to go and do the investigation" and stated separately that "on the union aspect," he had spoken with people who had been in the operating room. Jan. 8 Tr. at 6. And during the December 19, 2023 fact-finding meeting, Mr. Robinson explained that because Mr. Dorizas was on leave, Ms. Bruce "is in charge right now," so "at the end of the day she is the one who will handle this and [Mr. Dorizas] will be informed of the outcome." Bruce Dep. 175:7–13.

myself." *Id.* at 138:11–14. Ms. Knower cites this comment as evidence that Mr. Robinson was leading the investigation. But Ms. Bruce identified Mr. Robinson as "the delegate." She did not state that he was part of Mount Sinai's management, that he was leading the investigation, or that he was authorized to act on Mount Sinai's behalf. Because no reasonable jury could find that Mr. Robinson was Ms. Knower's employer or an agent of her employer, his statements cannot support Ms. Knower's Section 740 claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to Ms. Knower's Section 741 claim and DENIED as to her Section 740 claim. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 43.

SO ORDERED.

Dated: September 17, 2026
New York, New York

GREGORY H. WOODS
United States District Judge